# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| In re Gluth Bros. Construction, Inc., Debtor. | Bankruptcy No. 07-B-71375<br>Chapter 11<br>Judge Manuel Barbosa |
|---|---|

## MEMORANDUM OPINION

This matter comes before the Court on a motion brought by movant American Community Bank & Trust (the "Bank") to Vacate Order, and the Bank's Motion to Enforce Plan and Freeze Assets of the Estate Constituting Secured Lender's Collateral. For the reasons set forth herein, the Court will deny each of the Bank's motions.

### A. JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), (K) and (O).

### B. FACTUAL AND PROCEDURAL BACKGROUND

The Debtor filed a voluntary petition for relief under Chapter 11 with this Court on June 5, 2007. The Court entered an order on June 25, 2007, setting August 24, 2007, as the claims bar

date for non-governmental creditors. On August 14, 2007, the Bank filed a proof of claim for a prepetition loan (the "Loan") from the Bank to the Debtor, which had an original principal amount of $2,000,000 and for which the Debtor's principal, Frank Gluth, was jointly and severably liable. The proof of claim listed the amount of claim as of the petition date as $1,990,000, of which it characterized the entire amount as "secured."[1] The proof of claim did not list any amount of arrearage or other charges as of the petition date included in the claim, and did not indicate on the form that its claim included interest or other charges in addition to the principal amount of the claim. The proof of claim included as an attachment a copy of a Commercial Pledge Agreement by which the Guarantor, Frank Gluth, pledged certain of his personal collateral to secure the Loan. Although signed by the Debtor as "Borrower," the Commercial Pledge Agreement attached to the proof of claim did not purport to grant a security interest in any property of the Debtor. However, it appears from the pleadings that the Debtor signed its own Commercial Security Agreement in connection with the Loan, pursuant to which it granted the Bank a security interest in certain of its personal property, including proceeds of such collateral, and filed a UCC-1 financing statement with the Secretary of State of the State of Delaware. This security agreement included a provision in which it stated that:

> Cost and expenses include Lender's attorneys' fees and legal expenses whether or not there was a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.

The security agreement also contained a provision stating that:

> If payment is made by (Debtor), whether voluntarily or otherwise, or by guarantor or by any third party on the Indebtedness and thereafter Lender is forced to remit the amount of that payment ... to the (Debtor's) trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or ... by reason of any

---

[1] While the proof of claim listed the entire claim as secured, it only listed the total value of collateral as $988,712.08.

judgment, decree or order of any court ... the Indebtedness shall be considered unpaid for purpose of enforcing this Agreement and this Agreement shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Agreement or of any note or other instrument or agreements evidencing the Indebtedness and the Collateral will continue to secure the amount repaid or recovered to the same extent as if that amount had never been received by lender ....

On September 29, 2007, an auction of certain assets of the Debtor was held, which garnered gross proceeds of $1,053,993.50 and net proceeds of $988,617.26. The net proceeds were turned over to the Bank pursuant to an order entered by this Court on November 5, 2007. The order expressly noted that the order was without prejudice to any and all rights and claims the Debtor's estate or creditor's committee may have against the Bank.

At some point between November 2007 and April 2008, the Bank was paid the remaining balance on the Loan by the guarantor, Frank Gluth. In January 2008, a termination statement was filed with the Delaware Secretary of State, purporting to terminate the UCC-1 financing statement filed by the Bank. On April 4, 2008, the Bank filed a motion to be dismissed from the bankruptcy proceedings, in which it acknowledged "payment in full from the debtor" on its claims and requested an order confirming that it could retain the funds it received as proceeds of the auction. The Committee of Unsecured Creditors (the "Creditors Committee") filed an objection on April 7, 2008, to the Bank's motion, in which it argued that the Bank's intent in seeking to be 'dismissed as a party' was to avoid potential litigation by the Debtor or a bankruptcy trustee against the Bank. In the written objection, the Creditors Committee stated that the "Debtor's estate holds significant and valuable claims against the Bank." It described these potential claims in more detail in a footnote, in which it described the claims as, but "not limited to," the following: "(i) deepening insolvency and lender liability, (ii) declaratory

judgment concerning the validity, priority and extent of the Bank's liens, (iii) recovery of avoidable transfers made by the Debtor to Bank, as an 'insider' of the Debtor pursuant to section 101(31) of the Bankruptcy Code, and (iv) equitable subordination, recharacterization and/or marshalling." The Bank was granted time to file a response to the Creditor Committee's objection, but ultimately the motion was dismissed for want of prosecution after the Bank chose not to pursue its motion.

On April 9, 2008, the Debtor filed an objection to the Bank's sole claim, based in part on the fact that the Bank had represented that it had been paid in full in its April 4 motion. The Bank filed no response to the objection and did not otherwise contest the objection, and the Court entered an order disallowing the Bank's sole claim in its entirety on May 7, 2008 (the "May 2008 Order").

On July 26, 2008, a second auction was held of certain other assets of the Debtor, which generated gross proceeds of $932,247.00 and net proceeds of $864,840.93. Although the Bank now claims that at least some of the assets sold constituted collateral of the Bank, the Bank made no demand for proceeds of the auction and received no portion of the proceeds, since it had already been paid in full at that time.

On March 4, 2009, this Court entered an order (the "Confirmation Order") approving the Debtor's disclosure statement (the "Disclosure Statement"), confirming the Debtor's Plan of Liquidation Dated January 27, 2009 (the "Plan"), and vesting all assets of the estate in a Creditor Trust to be administered by the Creditor Trustee. The Disclosure Statement stated that:

> The Bank has been paid in full by the Debtor and Frank Gluth, personally. On May 8, 2008, the Bank's sole Claim, asserted as a Secured Claim in the amount of $1.990 million dollars – was disallowed by order of the Bankruptcy Court dated May 7, 2008, and has no further claims against the Debtor.

Elsewhere in the Disclosure Statement, it states that the Creditors Committee had helped administer the case, including "addressing issues concerning the Bank, its purported security interests and payments made on account of the Bank's claims (which ultimately resulted in the disallowance of the Bank's Claims)...." The Plan itself also discussed secured, priority and unsecured claims against the Debtor, but listed no claims, contingent or otherwise, of the Bank against the Debtor.

The Plan provides for payment in full of the "Allowed Claims of Creditors holding a security interest in the assets of the Debtor" in cash as soon as practicable following the effective date of the Plan, or the surrender of the collateral securing such claims. "Allowed Claim" is defined in the Plan as "a Claim ... proof of which is filed within the time fixed by the Bankruptcy Code, or that has been, or is hereafter, listed by the Debtor as liquidated in amount and not disputed or contingent, and to which no objection to allowance thereof has been raised by the Creditor Trustee or filed within any applicable period fixed by the Bankruptcy Court, or as to which a Final Order allowing such Claim has been entered." Since an objection had been raised to the Bank's sole claim, and the claim had been disallowed by the May 2008 Order, the Bank had no 'Allowed Claim' at the time of voting on the Plan. Because it had no Allowed Claim, the Bank was not entitled to vote to accept or reject the Plan. The Bank raised no objection to the confirmation of the Plan.

On June 4, 2009, the Creditor Trustee filed an adversary proceeding against the Bank, asserting claims for equitable subordination or recharacterization of the Loan, lender liability, deepening insolvency, preferential transfer and marshalling, and seeking a declaratory judgment

as to the amount of the loan obligations owed from the Debtor to the Bank and as to the validity, priority and extent of alleged liens. The adversary proceeding is still ongoing and the Bank has so far incurred over $40,000 in costs and legal fees in connection with defending against the adversary proceeding.

The Bank filed a motion on January 13, 2010, in which it asserted that the Loan documents, including the note and security agreement, provide for attorneys' fees, and that it therefore has a secured claim against the Debtor's estate for the costs and fees it has incurred and continues to incur in connection with the adversary proceeding. The motion requests an order protecting its rights as a secured creditor under the Plan, and requests an accounting of its collateral and an order freezing the Bank's collateral in possession of the Creditor Trustee in an amount sufficient to satisfy its claim for fees. At the first hearing on the motion, the Creditor Trustee raised an objection that, because the Bank's sole claim had been disallowed, it had no claim or rights under the Plan. The Bank then filed a motion on January 26, 2010, asking the Court to vacate the May 2008 Order.

## C. DISCUSSION

### (i)    The Bank has No Allowed Claim for Attorney's Fees and Costs

The term "claim" is broadly defined in Section 101(5) of the Bankruptcy Code to include any right to payment "whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, [or] undisputed ...." This was a change from the prior Bankruptcy Act of 1898, in which claims that were not "provable" were neither allowable nor dischargeable. See, e.g., 1 Robert E. Ginsberg & Robert D. Martin, Ginsberg &

Martin on Bankruptcy §10.02[A][1] (4th Ed. Supp. 2000). The Bank's right to indemnification for future attorneys' fees pursuant to the pre-petition Loan documents was a contingent, unliquidated claim as of the petition date. Attorneys fees and costs which are incurred post-petition, but which arise out of a pre-petition secured claim are specifically provided for by the Bankruptcy Code. Section 506(b) provides that, to the extent an allowed secured claim is oversecured, there shall be allowed to the holder of such claim "any reasonable fees, costs, or charges provided for under the agreement ... under which such claim arose." Therefore, during the time that the Bank had an allowed secured claim for which it was oversecured, the Bank conceivably had a right to attorneys' fees of the type sought. The problem is that at this point, and at the time that the fees were incurred, the Bank did not have an allowed secured claim. Its sole secured claim had been disallowed in its entirety by the May 2008 Order.

Nor did the Bank have a right to the fees through the Plan. Although the Plan provided for payment in full to holders of allowed secured claims, the Bank is not a holder of an allowed secured claim for purposes of the Plan. "Allowed Claim" is defined in the Plan as "a Claim ... proof of which is filed within the time fixed by the Bankruptcy Code, or that has been, or is hereafter, listed by the Debtor as liquidated in amount and not disputed or contingent, and to which no objection to allowance thereof has been raised by the Creditor Trustee or filed within any applicable period fixed by the Bankruptcy Court, or as to which a Final Order allowing such Claim has been entered." An objection was raised to the Bank's sole claim, and no Final Order allowing the claim was subsequently entered. The Bank has not argued that the objection was untimely, and the May 2008 Order disallowed the Bank's sole filed claim in its entirety. Therefore, the Bank does not now have an "Allowed Claim" for purposes of the Plan, and did

not have one at the time the Plan was confirmed. Since the Plan provides only for payment to Creditors with Allowed Claims, the Bank has no rights to enforce under the Plan.

Moreover, even if the Bank did have an allowed secured claim for purposes of Section 506(b) or the Plan, it still would not have a secured claim for the fees and costs sought, because the confirmed Plan did not specifically provide for payment of post-petition costs or fees for secured creditors. Section 506(b) "applies only from the date of filing through the confirmation date." In re 900 Corp., 327 B.R. 585, 600 (Bankr. N.D. Tex. 2005) (citing In re T-H New Orleans Ltd. P'ship, 116 F.3d 790, 797 (5th Cir.1997)). After confirmation, the creditors' rights to costs and fees are solely through the plan, and if the plan does not provide for fees or costs, then such creditor has no right through Section 506(b). Id. at 603. Here, the Bank's fees and costs accrued post-confirmation, and the Plan does not provide for them, so even if the Bank had an allowed secured claim, it would have no right against the estate.

### (ii) The Bank has No Lien or Other Right Against the Collateral

Although it is a long-standing principle that "liens pass through bankruptcy unaffected," see, e.g., Dewsnup v. Timm, 502 U.S. 410, 417 (1992), such liens can be avoided by operation of Section 506(d) or by operation of a confirmed plan. The Seventh Circuit Court of Appeals has clarified the principle that liens survive a bankruptcy proceeding, stating that "[t]hey do – unless they are brought into the bankruptcy proceeding and dealt with there." In re Penrod, 50 F.3d 459, 463 (7th Cir. 1995). In Penrod, the Court of Appeals held that, under Section 1141(c), unless a plan of reorganization or the order confirming it expressly "says that a lien is preserved, it is extinguished by the confirmation." Id. The court in Penrod added a caveat that such lien

would be extinguished only if "the holder of the lien participated in the reorganization." Id. However, the caveat does not apply here. The Bank not only had notice of the bankruptcy and Plan, but filed a proof of claim in the bankruptcy case and even received full payment of such claim through the bankruptcy case from the proceeds of the auction or through other means. As such, even if it did not vote on the Plan, the Bank participated in the Debtor's reorganization.

Moreover, the Plan, which the Bank received notice of and filed no objection to, expressly prohibits creditors from seeking to enforce their claims against the Debtor or against assets of the estate other than as provided in the Plan. The Plan contains an injunction stating:

> all Persons and Entities who have held, hold or may hold Liens, Claims or Interests in or against the Debtor or Interests in the Debtor are, with respect to any such Liens, Claims or Interests permanently enjoined from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Creditor Trust or any of its Property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the foregoing Creditor Trust, or any property of any such transferee or successor, (b) enforcing against, levying upon or attaching (including, without limitation, any pre-judgment attachment) the foregoing Creditor Trust, or any property of any such transferee or successor, (c) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, of any judgment, award, decree, claim, or order against the Creditor Trust, any of its Property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to the foregoing Creditor Trust, (d) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Liens, Claims or Interests of any kind against or in the Creditor Trust, any of its Property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the foregoing Creditor Trust, (e) asserting any right of setoff, subordination, or recoupment of any kind, directly or indirectly, against any obligation due the Debtor, the Creditor Trust, any of its Property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Creditor Trust, and (f) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of this Plan.

The Confirmation Order contained a similar injunction.

Additionally, any lien that the Bank might have had was extinguished by means of the May 2008 Order. While the order itself only speaks of disallowance, when combined with the operation of Section 506(d), the effect was to extinguish the Bank's lien. Section 506(d) states that "to the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void unless ... such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim." The Bank filed a proof of claim, and therefore the exception does not apply. It is true that disallowance of a claim will not always result in the avoidance of a lien, even where a proof of claim has been filed. For example, the Seventh Circuit Court of Appeals held in In re Tarnow, 749 F.2d 464, 465 (7th Cir. 1984), that the disallowance of a claim solely because of a procedural deficiency with respect to a proof of claim, such as filing a proof of claim late, would not void the related lien. However, the court also noted that:

> If the filing had been timely but the bankrupt or his (other) creditors had contested the claim on the ground that the loan had never been made, <u>or that it had been completely repaid</u>, or that repayment could not be enforced because the loan was usurious, and if the bankruptcy judge had agreed that the bankrupt had no legally enforceable obligation to the creditor and his decision was not disturbed on appeal, <u>the lien would be extinguished by operation of the doctrine of collateral estoppel</u>; the proceeding before the bankruptcy judge would have established facts and legal conclusions showing that the lien could not possibly be valid.

Id. (emphasis added). Here, the claim was disallowed because it was determined that the claim had been completely repaid.

Therefore, because of the May 2008 Order and the Confirmation Order, despite any rights that might have been provided by the Debtor to the Bank by contract, the Bank has lost

those rights, and no longer has any rights against the Debtor or against the assets of the estate for its costs and attorneys' fees. If the Bank had wished to maintain its contractual right to reimbursement or indemnification for subsequent costs and fees, it should have raised objections to the motion to disallow its claim or to confirmation, or appealed the May 2008 Order or Confirmation Order. If the Bank had the foresight to put such a provision into its loan documents, it should have had the foresight to protect the right. Nor can it claim surprise. In the Creditor Committee's objection to the motion to dismiss as a party, filed nearly a month before the May 2008 Order was entered, the Creditor Committee listed the potential claims it thought it had against the Bank. The Bank cannot now collaterally attack the effects of either the May 2008 Order or the Confirmation Order or the Confirmed Plan.

### (iii)    The Request to Vacate Order or Reconsider Claim

#### (a)    Section 502(j)

Section 502(j) of the Bankrupcty Code, together with Bankruptcy Rule 3008, provides that a party in interest may move for reconsideration of an order allowing or disallowing a claim for cause, and that a reconsidered claim may be allowed or disallowed "according to the equities of the case" after a hearing on notice. "Cause" is not defined in either Section 502(j) or Rule 3008, and courts generally look to the standard for reconsideration in Fed. R. Civ. P. 60, which is made applicable by Fed. R. Bankr. P. 9024. See, e.g., In re XPedior Inc., 354 B.R. 210 (Bankr. N.D. Ill. 2006) (Schmetterer, J.) (noting that "Fed. R. Bankr. P. 9024 provides that Fed. R. Civ. P. 60 governs the reconsideration of orders allowing or disallowing claims" except that the one-year time limitation in Rule 60(b) does not apply to orders allowing or disallowing a claim

entered without contest); In re United Airlines, Inc., Nos. 08-3428, 08-3429, 2009 WL 838164 (7th Cir. Mar. 31, 2009) (analyzing motion to reconsider brought under Rule 3008 under Rule 60(b) standard, and citing In re Wylie, 349 B.R. 204, 209-11 (9th Cir. B.A.P. 2006) (explaining that Rule 3008 motions are governed by Rule 60(b) if filed more than ten days after entry of judgment)); Wells Fargo Fin. Leasing, Inc. v. ComDisco, Inc., No. 05-CV-129, 2006 WL 1519324 (N.D. Ill. May 30, 2006) (stating that because "the Bankruptcy Code does not define 'cause,' courts find the standard for reconsideration under Section 502(j) in Rule 60, which governs relief from judgment). Rule 60(b) lists six grounds for relief from a final order, of which the Bank asserts the 5th and 6th apply: "(5) ... applying [the judgment] prospectively is no longer equitable; or (6) any other reason that justifies relief."

### (b)    Rule 60(b)(5)

The Seventh Circuit Court of Appeals has stated that judgments are "prospective" for purposes of Rule 60(b)(5) when they are "executory" or "involve the supervision of changing conduct or conditions." Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc., 131 F.3d 625, 630 (7th Cir. 1997) (citing Twelve John Does v. District of Columbia, 841 F.2d 1133, 1138 (D.C. Cir. 1988)). Further citing Twelve John Does, the court noted that "[v]irtually every court order causes at least some reverberations into the future, and has, in that literal sense, some prospective effect; even a money judgment has continuing consequences, most obviously until it is satisfied, and thereafter as well inasmuch as everyone is constrained by his or her net worth. That a court's action has continuing consequences, however, does not necessarily mean that it has 'prospective application' for the purposes of Rule 60(b)(5)." Id.

The Court finds that the May 2008 Order is not "prospective," and therefore the Bank cannot rely on Rule 60(b)(5) to support its request to vacate the order or re-evaluate its claim. The allowance or disallowance of a claim is simply a determination of how much is owed to a creditor and the relative priority of that creditor's right to payment. It is therefore almost identical to a money judgment, which under 7th Circuit precedence would not constitute a "prospective" order for purposes of Rule 60(b)(5). Even if the allowance or disallowance of a secured claim is considered a determination of rights in specific property, it is little different than the declaratory judgment regarding title to a painting that was deemed non-prospective in DeWeerth v. Baldinger, as cited by the court in Cincinnati Ins. 131 F.3d at 630-31 (citing DeWeerth v. Baldinger, 38 F.3d 1266, 1276 (2d Cir. 1994)). The May 2008 Order did not compel the Bank or the Debtor to perform, or order them not to perform, any future act. Id. Even if the order had been denied, the only future effect would have been an obligation of the Debtor or trustee to make payments on an obligation, which is virtually identical to a money judgment. Nor did the order require the Court to supervise any continuing interaction between the Debtor and the Bank. Id.

Additionally, there has not been a "change in circumstances," as is required for relief under Rule 60(b)(5). The Supreme Court has stated, "Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests, but the Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" Horne v. Flores, 129 S. Ct. 2579 (2009) (citing Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384 (1992)). The Bank, as the party seeking relief, "bears the burden

of establishing that changed circumstances warrant relief." Id. The Bank argues that the change in circumstances was the subsequent filing of the adversary proceeding out of which the costs and attorneys' fees sought arose, and which was not filed until well after the May 2008 Order and the Confirmation Order were entered. However, in the context of what the May 2008 Order decided, the filing of the adversary cannot be considered a 'changed circumstance,' much less one warranting the relief sought. The determination of claims includes the determination of contingent or unliquidated claims. As Section 502(c) states, "there shall be estimated for purpose of allowance under this section ... any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." Such an estimate involves an element of guesswork and prediction. But Rule 60(b) should not be used to vacate an order simply because it turns out that the prediction turned out to be wrong. It is incumbent upon the parties in the original determination to demonstrate why they believe a contingent claim has value. This is especially true here, where the subsequent filing was entirely predictable at the time the order was entered. Not only was the Bank aware of potential future claims in general, as demonstrated by the fact that the Bank included the indemnification provision in the loan documents, but the Creditors Committee had listed the precise claims it intended to bring in its objection to the Bank's motion to dismiss as a party. Also, the May 2008 Order was not simply a prediction of the size or nature of any future litigation, it was a determination of whether the Bank had a valid contingent claim at the time of the order. The Bank's sole claim was disallowed in its entirety, meaning its right to future indemnification was disallowed at the time of the order, whether there was any future litigation or not. Therefore, the

commencement of the adversary proceeding cannot be seen as a significant change in factual conditions warranting relief under Rule 60(b)(5).

Moreover, it would not be equitable to grant the Bank relief. As noted above, the future commencement of the adversary was predictable at the time the order was entered, and it was the Bank's own fault that it failed to timely object to either the May 2008 Order or the Confirmation Order. Also, the other creditors would be prejudiced if the Bank was granted relief. The Disclosure Statement in connection with the Plan expressly stated that all of the claims of the Bank against the estate had been paid in full, and the other creditors relied on this fact when they voted on the Plan. Moreover, even if the filing of the adversary was an 'unexpected change in circumstances,' the Bank waited nearly 8 months after the adversary was filed before it filed its motion to vacate. During that time, the Bank accrued over $40,000 in costs and fees for which it now asks to be reimbursed out of the estate, plus the additional future expenses it will incur for the duration of the adversary. Had the Creditor Trustee known that the Bank might have a potential secured claim against the estate for its attorneys' fees in defense of the adversary, it might have affected the Creditor Trustee's cost/benefit risk analysis in deciding how to litigate against the Bank in the adversary and whether or not to settle. While the "reasonableness" of a delay varies between cases, the Seventh Circuit Court of Appeals has "found a delay of less than five weeks unacceptable" in some cases, and "to be reasonable, a delay ought to have a good explanation." Casio Computer Co. v. Noren, No. 01-3250, 2002 WL 552350 (7th Cir. Apr. 5, 2002). Here, the Debtor has not given any explanation other than carelessness or sitting on its rights.

### (c)    Rule 60(b)(6)

For similar reasons, Rule 60(b)(6) does not justify granting the Bank relief. While the statutory text seems broad, the Supreme Court has held that "[t]o justify relief under subsection (6), a party must show 'extraordinary circumstances' suggesting that the party is faultless in the delay." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 393 (1993). This means "a more compelling showing of inequity or hardship is necessary to warrant relief under Rule 60(b)(6) than under Rule 60(b)(5)." Cincinnati Ins., 131 F.3d 625 at 631 (citing Twelve John Does, 841 F.2d at 1140). For the reasons stated in the previous section, the Bank has not met this standard. Because the subsequent filing of litigation against the Bank was predictable at the time the May 2008 Order and Confirmation Orders were entered, the Bank was not blameless for failing to raise objections. Moreover, even if the adversary was unpredictable, the Bank was at fault for failing to file a motion to vacate the order for over a half a year after the adversary was commenced. Therefore, like in Cincinnati Ins., the Bank "cannot prevail in light of the unextraordinary nature of any resulting inequities and the strong policy favoring finality of decisions." 131 F.3d at 631.

### D.    CONCLUSION

For the foregoing reasons, the Bank's Motion to Vacate Order and Motion to Enforce Plan and Freeze Assets of the Estate are each DENIED.

THEREFORE, IT IS ORDERED that

the foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

DATE: March 24, 2010

The Honorable Manuel Barbosa
United States Bankruptcy Judge