## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| In re Gluth Bros. Construction, Inc., <br><br> **Debtor.** | Bankruptcy No.  07-B-71375 <br> Chapter 11 <br> Judge Manuel Barbosa |

## MEMORANDUM OPINION

The United States Trustee, joined by the Creditor Trustees on behalf of the liquidating trust formed by the confirmation of the Debtor's Chapter 11 Plan, object to the final fee application filed by the Debtor's attorney, Querry & Harrow, Ltd. ("Q&H"), and also seek to disgorge the fees previously received by Q&H.  Three interim fee applications, totaling $273,892.34 in fees and expenses were already approved and received by Q&H.  Q&H's final fee application seeks an additional for $56,941.50 in fees and $324.29 in expenses, which Q&H is currently holding in escrow. Primarily as a sanction for Q&H's failure to comply with the disclosure requirements set forth in Bankruptcy Rules 2014 and 2016, the Court will grant the cumulative expenses in full, but will reduce the cumulative fees by 40%, meaning only a cumulative amount of $202,420.53 in fees and expenses will be approved.  Q&H is ordered to disgorge the remaining $128,737.60 in fees previously received or held in escrow, but that are hereby disapproved, to the Creditor Trustees on or before November 18, 2011.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal

Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), (M) and (O).

## II. FACTS AND BACKGROUND

### A. Overview of the Bankruptcy

The Debtor is an Illinois corporation that filed for protection with this Court under Chapter

11 of the Bankruptcy Code on June 5, 2007. At the time the petition was filed, the Debtor was in the

sewer and plumbing construction industry and was solely owned by Frank Gluth. The Debtor's

schedules listed assets of $3,214,429.80 of personal property and $0 of real property, and liabilities

of $8,150,878.70, consisting of $2,103,707 of secured debt, $38,836.21 of priority claims and

$6,008,335.49 of general unsecured debt. Of the general unsecured debt listed, $3,622,318.00 was

to Frank Gluth for "loans from 2002 to present."

The Debtor initially hoped to continue operating and pay its debts through a plan of

reorganization. On April 30, 2008, the Debtor filed a joint plan of reorganization with the Unsecured

Creditors Committee, which generally provided to pay all creditors 100% plus 5% interest out of

income generated by the continuing operation of the company. Frank Gluth agreed to guarantee the

payments in the plan, in part in exchange for the right to certain real estate known by the parties as

the "Shop Parcel," discussed in more detail below, in which Frank Gluth had asserted an interest but

which turned out to be owned by the Debtor. This plan was never confirmed. On January 23, 2009,

the Debtor filed a "Notice of Debtor's Withdrawal from Proposed Joint Plan," in which the Debtor

alleged that "[d]uring the summer of 2008, with the downturn in the economy, Debtor was unable

to procure any new contracts," and stated that "Debtor was forced to close its doors and is no longer

operating." (ECF No. 577). Attached to the document was another document entitled "Frank Gluth's

Notice of Withdrawal From Proposed Joint Plan." The U.S. Trustee had filed a motion to convert

the case to Chapter 7 on December 23, 2008, and the Court entered an agreed order on January 28,

2009, resolving that motion by allowing the Unsecured Creditor Committee to file a liquidating plan

of reorganization, and if such plan was not confirmed on or before March 25, 2009, the case would

be converted to Chapter 7. The Unsecured Creditors Committee did file a plan of liquidation on

January 27, 2009, which was modified on February 11, 2009, and confirmed on March 4, 2009. The

confirmed plan created a Creditor Trust to administer and liquidate the assets of the estate.


### B.  Debtor's Relationship with and Retention of Querrey & Harrow

Q&H was first contacted about representing the Debtor in a possible bankruptcy in March

2007, and was formally retained to represent the Debtor on April 10, 2007. Before then, Q&H had

not represented the Debtor, but it had represented the Debtor's principal and sole owner, Frank Gluth.

Jeanne Miller had previously represented Frank Gluth while at Q&H as well as representing the

estate of his wife, who had owned shares in the Debtor until she died in 2004. Ms. Miller probated

the estate of Mr. Gluth's wife in 2004 and 2005. She also represented Frank Gluth in 2004 and 2005

to work on his own estate planning, and continued to perform such work for Mr. Gluth from time

to time until at least early 2007.

In December 2006, Ms. Miller did some work for Mr. Gluth relating to two pieces of real estate, referred to by the parties as the "Shop Parcel" and the "Rolling Hills Lots," which turned out to be owned by the Debtor but which Mr. Gluth claimed he owned. In December 2006, Mr. Gluth asked Ms. Miller to help him transfer these parcels into a living trust. (Tr. 229:14-19).[1] Although the transfers were never effectuated, she did some initial research which cast serious doubt as to who owned them. The Shop Parcel was held in a land trust, and in a letter from Ms. Miller to Mr. Gluth dated January 2, 2007, Ms. Miller indicated that at that time she was "of the understanding that either [Frank Gluth], individually, or [his] corporation, Gluth Construction, is/are the sole beneficiaries of these respective land trusts." (UST Ex. 44-1). In a January 30, 2007 letter to Mr. Gluth, Ms. Miller indicated that she had done a title search for the Rolling Hills Lots, but was unable to find a filed deed. (UST Ex. 45-1). Instead, from the letter it appears that at that time the only evidence of ownership for the second parcel that Ms. Miller could locate was an installment agreement for warranty deed that indicated the purchaser was Frank Gluth only in his capacity "FOR GLUTH BROS. CONSTRUCTION, INC." (UST Ex. 46). In the January 30, 2007 letter to Mr. Gluth, Ms. Miller requested further documentation and asked Mr. Gluth to "call me at your earliest convenience to discuss the resolution of the title issues concerning these properties." This implied that the representation was not complete as of January 30 and continued for some time thereafter, though Ms. Miller testified that Mr. Gluth never provided her the requested documents and she did no further work on the proposed transaction. (Tr. 328:1-7). The transaction was never consummated.

In March 2007, Hank Fleming, the Debtor's outside accountant, called Ms. Miller to inquire

---

[1] All references to the transcript are to the combined transcript for the trial held on May 10, 2011, and continued on May 12, 2011, May 23, 2011, May 31, 2011 and June 3, 2011.

about whether Q&H could represent the Debtor in a possible bankruptcy filing. Ms. Miller knew

Mr. Fleming from her work for Mr. Gluth, and also knew the Debtor's internal bookkeeper from her

work for Mr. Gluth. Ms. Miller, who only did real estate and estate planning work, referred the

matter to Mr. Benjamin and Ms. Berneman in the bankruptcy department of Q&H. She testified that

at the time she referred the matter to Mr. Benjamin and Ms. Berneman, she told them Frank Gluth

was a client of the firm. (Tr. 262:18-20).

Q&H had an initial 'no obligation consultation' with the Debtor on March 8, 2007, at Mr.

Fleming's office which Ms. Berneman, Mr. Benjamin and Ms. Miller attended. On April 10, 2007,

the Debtor entered into an attorney retention agreement with Q&H. Pursuant to the agreement, the

Debtor paid Q&H an advance payment retainer of $13,500.00 plus a court cost advancement in the

amount of $1,500. Frank Gluth also individually signed a guarantee by which he guaranteed all

obligations owed by the Debtor under the retention agreement. Q&H presented no written evidence

that its representation of Frank Gluth individually was ever terminated. However, the Q&H attorneys

testified that as soon as the firm began representing the Debtor they ceased representing Mr. Gluth.

(See, e.g., Affidavit of Jeanne Miller, UST Ex.40-1, ECF No. 680).

Q&H took no efforts to 'screen' Ms. Miller from the bankruptcy matter. To the contrary,

testimony showed that she actively participated in the bankruptcy case. While Ms. Miller stated that

she was a real estate lawyer, not a bankruptcy lawyer, and that she was not heavily involved or on

the 'bankruptcy team,' the testimony showed that Ms. Miller was present at the initial conferences

with Mr. Gluth, Mr. Fleming and the bankruptcy attorneys in the spring of 2007. At least on

occasion the bankruptcy attorneys used Ms. Miller as a conduit to get information from Mr. Gluth

or his accountant or bookkeeper, due to her prior relationship with Mr. Gluth and his employees. (Tr. 293:5-24). Additionally, the bankruptcy attorneys had Ms. Miller look into several real estate issues, including the ownership of the Shop Parcel and the Rolling Hills Lots.

### C. Ms. Miller's Subsequent Representation of Frank Gluth

If Ms. Miller's representation of Mr. Gluth while at Q&H before the bankruptcy was filed did not already complicate matters, she subsequently left Q&H and began representing Mr. Gluth while the bankruptcy was still pending. In February 2008, Ms. Miller resigned from Q&H to start her own practice. Almost immediately, she began representing Mr. Gluth individually, including to help "protect his personal interest in the [bankruptcy] estate." (Tr. 285:18-19). She sent him an e-mail two weeks before her last day at Q&H in which she informed him that she was starting her own firm and asked if he would "choose to have your files follow me so that I can continue to represent you." (UST Ex.54-1). She appeared in Court on behalf of Mr. Gluth in the bankruptcy, and filed several pleadings on his behalf. On January 23, 2009, a Notice of Frank Gluth's Withdrawal From Proposed Joint Plan, signed by Frank Gluth, was filed, with a statement that the filing was by Frank Gluth "by and through his attorney, JEANNE MILLER." (UST Ex. 56; ECF No. 577). This filing was actually filed through ECF by Beverly Berneman at Q&H. In a series of e-mails between Ms. Miller and Ms. Berneman, Ms. Berneman offered to both draft the withdrawal for Mr. Gluth to sign and to file it. As Ms. Berneman stated in her e-mail, she and Mr. Benjamin suggested "that Frank's withdrawal be an exhibit to the Debtor's notice of withdrawal. That way we can file them together without looking like we represent Frank." (UST Ex. 55-1). On April 7, 2009, Ms. Miller filed a "Request for Payment

of Administrative Expenses" on behalf of Mr. Gluth, requesting approval of a claim for

administrative expenses of over $1.5 million.

### D. Disclosure of the Prior Representation and Compensation

The bankruptcy petition was signed by Frank Gluth, as president of the Debtor, and Robert

Benjamin of Querrey & Harrow, Ltd., as attorney for the Debtor.  The petition, which was filed on

June 5, 2007, did not include a Form B-203 Rule 2016(b) disclosure of income paid to or promised

to an attorney, nor was one filed within 14 days of the petition date.  Answer 9 to the Debtor's

Statement of Financial Affairs, filed with the petition, stated that the Debtor made a payment of

$15,000 to Q&H on April 10, 2007.  On June 6, 2007, Q&H filed a motion and application to

employ Q&H as counsel for the Debtor.  The motion stated that the "firm of QUERREY &

HARROW, LTD. is not owed any money by the estate nor does it have any interest adverse to the

interests of this estate or any class of creditors or equity security holders and is considered a

disinterested person under the Bankruptcy Code and accordingly qualified to serve as counsel

pursuant to Section 327 of the Bankruptcy Code." (Mot. To Employ, 5, ECF No. 5).  Paragraph 7

of the motion stated that the "Debtor believes that the above described counsel should be paid their

normal hourly rate," but did not state what that rate was. Id. Attached to motion to employ was an

affidavit of Robert Benjamin.  In the affidavit, Mr. Benjamin again repeated that the "firm of

QUERREY & HARROW, LTD. is not owed any money by the estate nor does it have any interest

adverse to the interests of this estate or any class of creditors or equity security holders." (Mot. To

Employ, Attach. 1:4, ECF No. 5).  He went on to state that the "only contacts that QUERREY &

HARROW, LTD. has had with the Debtor is when the Debtor retained it to represent its interests in connection with Debtor's financial problems and the filing of the instant Chapter 11 case" and that to the best of [his] knowledge, QUERREY & HARROW, LTD. has no connections with the creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee or any person employed in the office of the United States Trustee." (Mot. To Employ, Attach. 1:5-6, ECF No. 5). With respect to compensation, the affidavit stated that the "compensation paid or agreed to be paid by the debtor is our normal hourly rate. QUERREY & HARROW, LTD. has requested and is holding a retainer of $7,905.00 plus a cost advancement of $1,039.00. The Debtor was the source of the retainer." (Mot. To Employ, Attach. 1:2, ECF No. 5).  Neither the motion to employ nor the attached affidavit of Mr. Benjamin mentioned that another attorney at Q&H, Jeanne Miller, had previously represented the Debtor's principal and sole owner, Frank Gluth. Nor did it mention that Frank Gluth had guaranteed Q&H's fees. In reliance on the accuracy of the motion and the affidavit, this Court approved the employment of Q&H on June 25, 2007.

Q&H only disclosed the prior representation of Mr. Gluth by filing a supplemental affidavit of Robert Benjamin and an affidavit of Jeanne Miller on May 6, 2009, nearly 2 years after the bankruptcy petition was filed, after three interim fee applications totaling over $200,000 were granted, and only after the U.S. Trustee objected to Q&H's final fee application. (ECF Nos. 680, 681). However, rather than conceding the incorrectness of the original affidavit, Mr. Benjamin argued in the supplemental affidavit that his original statement of no connection with creditors or their attorneys "remains correct." He argued that the firm would only have had a "connection" to Mr. Gluth or his attorneys if Ms. Miller or Q&H currently represented Mr. Gluth as of the date of the

affidavit, and that Ms. Miller ceased representing Mr. Gluth individually when the firm was retained

by the Debtor. Additionally, no disclosure was ever filed to indicate that Ms. Miller had left Q&H

and begun representing Mr. Gluth individually, including in matters related to the bankruptcy.

Q&H similarly did a poor job of disclosing compensation they received post-petition. Q&H

filed a First Interim Fee Application on October 15, 2007 (ECF. No. 145) for $63,952.50 in fees and

$2,648.80 in expenses, which was approved on November 19, 2007, and which also granted Q&H

leave to apply the remaining retainer of $7,905 and cost advancement of $1,039. Q&H filed a

Second Interim Fee Application on February 27, 2008 (ECF. No. 286) for $104,762.50 in fees and

$2,544.40 in expenses, which was approved on March 27, 2008. Q&H filed a Third Interim Fee

Application on September 19, 2008 (ECF. No. 522) for $96,187.50 in fees and $3,796.64 in

expenses, which was approved on October 15, 2008, and which also permitted the amount in that

fee application to be withdrawn from the balance of sale proceeds of certain assets of the estate

which were being held at the time by Q&H. Finally, Q&H filed their final application for

compensation on April 2, 2009 (ECF No. 659) for $56,941.50 in fees and $324.29 in expenses.

Although each of the later fee applications noted and listed the previously granted fee

applications, none made any reference to the fact that Q&H had been paid any amount of the

authorized fees or how much. Nor did Q&H file a 2016(b) statement within 14 days after receipt

of any payment. Instead, Q&H only filed a disclosure of compensation on July 22, 2011 (ECF No.

883), well after the Court held the trial on the objections to the final fee application, and only after

the Court entered an order to compel Q&H to do so on the U.S. Trustee's motion. According to that

disclosure statement, Q&H received payments from the Debtor of $15,000 on April 10, 2007,

$35,000 on December 1, 2007, $15,000 on December 21, 2007, $7,518.30 on February 5, 2008, and $55,000 on April 17, 2008, and also received $99,984.14 on October 20, 2008 from a portion of the proceeds of the sale of certain estate property. While Q&H had not filed a 2016(b) statement at the time the payments were made, these payments were reflected in the monthly operating reports of the Debtor filed on January 29, 2008 (ECF No. 212), March 20, 2008 (ECF No. 326), May 15, 2008 (ECF No. 430), and January 5, 2009 (ECF No. 567), though in no case were these reports filed within 14 days of the receipt of the payments disclosed. Additionally, according to the July 2011 disclosure statement Q&H also received payments from Frank Gluth individually of $25,000 on June 5, 2008 and $27,336.50 on July 9, 2008. Neither of the monthly reports for June or July 2008 reflected the payments from Frank Gluth, nor were they disclosed until the July 2011 disclosure statement.

### E.  Potential Conflicts of Interest

At the time of the petition Mr. Gluth felt that a successful reorganization of Gluth Bros. was both in his own and the Debtor's best interest, but from early on their interests were adverse on a number of issues. First, although the Debtor approached Q&H in early March 2007 and officially retained Q&H on April 10, 2007, the Debtor did not file its bankruptcy petition until June 5, 2007. Delay in filing the petition could have benefited Mr. Gluth to the detriment of the Debtor. The Debtor had repaid Mr. Gluth on a loan $227,502.74 on March 31, 2006, and $450,000.00 on May 24, 2006, (UST Ex. 20-1), and therefore by waiting until after May 24, 2007, to file the petition, these payments were no longer within the 1-year preference avoidance period for insiders. Q&H

argues that the delay in filing was not calculated for this purpose, but was rather because it took time to gather information and prepare schedules.

Second, Mr. Gluth claimed that he owned certain real estate, which it turns out was owned by the Debtor. Their interests were therefore adverse on this issue. These properties were listed in Schedule G to the petition as leases from Frank Gluth to the Debtor rather than in Schedule A as real estate owned by the Debtor.

One parcel, referred to by the parties as the "Shop Parcel," was titled in the name of the Debtor at least until September 1977. In September 1977, Frank Gluth and his brother James, individually, purported to transfer the property into a land trust by signing a deed in trust. However, no recorded deed had ever transferred the property from the Debtor to Frank and his brother, and no one has been able to locate even a copy of such a deed. Since there is no evidence that Frank and his brother owned the Shop Parcel when they signed the Deed in Trust, it was ineffective to transfer the property, which remained property of the Debtor.

Frank Gluth attempted to sell the Shop Parcel along with some adjacent property that he owned to a business acquaintance, Charles Ruth, who indicated an interest in purchasing the property in the spring of 2007. Mr. Ruth made an offer to purchase the land for $3,400,000 in May 2007, and Frank Gluth purported to grant a right of first refusal in the same land to an entity Mr. Ruth owned in October 2007. Mr. Gluth did not inform Q&H of these attempts to sell the land, and instead hired another attorney, Tom Zanck, to represent him in the transaction. Tom Zanck's office sought a title company opinion as to who owned the land for sale, but the title company indicated that the Shop Parcel was owned by the Debtor, not Frank Gluth. Mr. Zanck's office faxed a copy of the title

commitment that listed the Debtor as the owner of the Shop Parcel to Ms. Miller on June 7, 2007.

Ms. Miller highlighted the issue to Mr. Benjamin and Ms. Berneman, who asked her to look into it

further. Ms. Miller researched the issue, and learned of the defective trust grant. Ms. Miller

prepared a legal memorandum on or about July 23, 2007, in which she concluded that the deed in

trust was ineffective to transfer title to the trust and that therefore title remained with the Debtor.

She also noted that "even if I was able to make a convincing argument that the Deed in Trust should

be recognized, I believe we would lose the battle to prove that Frank is the Trust's sole beneficiary."

(UST Ex. 51). Ms. Miller sent the memorandum to Ms. Berneman and Mr. Benjamin. Ms.

Berneman agreed with Ms. Miller's conclusion, and stated in an e-mail to Mr. Benjamin, "I believe

that we have no alternative but to amend the schedules to add the property. Once that takes place,

we can bring a motion for leave to sell the property which will result in a much needed infusion of

capital into the company." (UST Ex. 53). Mr. Benjamin apparently disagreed, and instead believed

Mr. Gluth when he told him that he was certain that he could find a missing unrecorded deed that

could prove the transfer. Therefore, the Debtor never amended the bankruptcy schedules to list the

property, even though Mr. Gluth never produced a missing deed. Q&H notified the Unsecured

Creditors Committee of the issue relating to the Shop Parcel by calling the Committee's counsel,

Aaron Hammer, in September 2007. Q&H sent Mr. Hammer copies of the trust documents, which

seemed to show that Mr. Gluth was the owner of the Shop Parcel, but never sent a copy of Ms.

Miller's memorandum or any other evidence or information to show that the trust documents were

not effective.

Ms. Miller claims that she did not learn that a second parcel, referred to by the parties as the

"Rolling Hills Lots," was owned by the Debtor until April 8, 2009. She had left Q&H and was

representing Mr. Gluth at the time. For some unspecified reason, she did a title search on the Rolling

Hills Lots in April or March 2009 and learned that they were titled in the name of the Debtor. She

could not explain why her earlier search in January 2007 had not revealed this fact. Ms. Miller sent

an e-mail to Ms. Berneman and Mr. Benjamin in April 2009 to highlight the fact that she had just

learned that the property was owned by the Debtor, not Mr. Gluth. Mr. Benjamin forwarded this e-

mail to the Creditor Trust's attorney, Aaron Hammer, on April 14, 2009.

Testimony showed that the ownership of the Shop Parcel and Rolling Hills lots was discussed

in detail in the prepetition meetings between the Debtor and Q&H (Tr. 269). But, to the extent it was

discussed, Q&H apparently concluded that they were owned by Frank Gluth and were solely rented

by the Debtor, and did not list them as property of the Debtor. Instead, they were listed as rental

property under "executory contracts." As of the time of trial, the Creditor Trustees were attempting

to sell the Shop Parcel, which they listed for $900,000, and the Rolling Hills Lots, which they listed

for $952,875. While the listing price is not necessarily an accurate indicator of the value of the

property, it does tend to show that the properties were of substantial value.

### III DISCUSSION

#### A. Disclosure of Compensation Received and Agreements Regarding Compensation

The Bankruptcy Code requires debtors' counsel to disclose any payments they have received

or any agreements they have made relating to compensation or reimbursement of expenses for

representation of a bankruptcy debtor, regardless of the source of payment and regardless of whether

the attorney seeks payment from the estate. Under Section 329(a), any

> attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

11 U.S.C. §329(a). Federal Rule of Bankruptcy Procedure 2016(b) implements Section 329(a) by

requiring that every

> attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

Fed. R. Bankr. P. 2016(b).

If the attorney seeks payment from the estate, the attorney must also comply with Rule

2016(a), under which an

> entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. An application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared and whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefor, except that details of any agreement by the applicant for the sharing of

compensation as a member or regular associate of a firm of lawyers or accountants shall not be required.

Fed. R. Bankr. P. 2016(a).[2]

The information required to be disclosed under Section 329(a) and Rule 2016 is essential to implement Section 329(b), under which the court may cancel any agreement for compensation for services in contemplation of or in connection with the case or return any such payment to the extent the compensation "exceeds the reasonable value of any such services." 11 U.S.C. § 329(b). Therefore, the fee disclosures are mandatory, not permissive. See, e.g., In re Mortakis, 405 B.R. 293, 297 (Bankr. N.D. Ill. 2009) (Squires, J.). Even if the compensation itself would be reasonable, the failure to disclose it "is sanctionable and can include partial or total denial of compensation, as well as partial or total disgorgement of fees already paid." Id., 405 B.R. at 297 (citing In re Prod. Assocs., Ltd., 264 B.R. 180, 186, 189 (Bankr.N.D.Ill.2001)). "The extent to which compensation should be denied rests with the Court's sound discretion." Id., 405 B.R. at 297 (citing Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.), 63 F.3d 877, 882 (9th Cir.1995)). However, "[m]any courts, perhaps the majority, punish defective disclosure by denying all compensation." Id., 405 B.R. at 297 (citing, Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.), 4 F.3d 1556, 1566 (10th Cir.1993); In re Griffin, 313 B.R. 757, 764 (Bankr.N.D.Ill.2004)).

Q&H failed to comply with the disclosure requirements of Section 329 and Rule 2016 in a number of respects. First, despite the fact that the Judicial Conference of the United States has

---

[2]In the Northern District of Illinois, the recently issued General Order No 11-2 also requires that all agreements for compensation between a debtor and an attorney must be in writing and must be filed with the Rule 2016(b) disclosure statement. However, this general order was not in effect when this case was filed.

prescribed an official form for disclosure of compensation of attorney for a debtor, Form B-203,

Q&H filed no such formal disclosure under Section 329(a) or Rule 2016(b) until over four years after

the petition date and the original deadline had passed, and only after the Court issued an order

compelling the firm to do so. Mr. Benjamin testified that he decided "not to file a statement pursuant

to Section 329(a)" because "the information was provided in my affidavit [attached to the motion

to employ] anyway and it is in [the Statement of Financial Affairs.]" (Tr. 633:16-19). However, use

of the official forms is mandatory. See Fed. R. Bankr. P. 9009 (the "Official Forms prescribed by

the Judicial Conference of the United States shall be observed and used with alterations as may be

appropriate"); see also, Fadayiro v. Ameriquest Mortg. Co., 371 F.3d 920 (7th Cir. 2004) ("[A]ll

bankruptcy is practiced through Official Forms; and unlike normal federal civil practice, where the

forms are illustrations, in bankruptcy they are mandatory. The bankruptcy community believes this

essential to the mass-production system that is modern bankruptcy adjudication."). Courts, the U.S.

Trustee and creditors and other parties in interest who may question payments to a debtor's attorney[3]

should not be forced to scour the docket searching for disclosure of compensation buried among the

debtor's schedules and other filings. Also, by disclosing compensation information piecemeal in

scattered pleadings instead of using the required form, the disclosure is confusing and possibly

misleading. Thus, for example, the Debtor listed a payment of $15,000 to Q&H on April 10, 2007

in its answer to Question 9 on its Statement of Financial Affairs, while the affidavit attached to the

motion to employ stated that Q&H was holding a $7,905 retainer and a $1,039 cost advancement.

---

[3]See Fed. R. Bankr. P. 2017(a), giving any party in interest the right to request a hearing
on the reasonableness of any prepetition payments to an attorney, and Fed. R. Bankr. P. 2017(b),
giving the debtor and the U.S. Trustee the right to request a hearing on the reasonableness of any
postpetition payment by the debtor to an attorney.

The Court or parties in interest would have had to have to put those two documents together to understand that Q&H had apparently applied $6,056 for prepetition services against the retainer, and even then such a conclusion would be at most a guess.[4]

Second, even assuming that disclosure other than through a Form B-203 was a meaningful way to disclose compensation, numerous payments or agreements regarding compensation were either never disclosed or were not timely disclosed. Thus, for example, other than in exhibits offered by and testimony elicited by the U.S. Trustee at trial, Q&H has still never formally disclosed that Frank Gluth guaranteed all of the obligations of the Debtor under the attorney retention agreement with Q&H. Also, while Q&H argued that post-petition payments to Q&H, totaling over $300,000, were disclosed in the Debtor's monthly operating reports, this is still problematic. First, the monthly operating reports that listed payments directly from the Debtor were not filed within 14 days of receipt of those payments, and therefore were untimely under Rule 2016(b). Second, the $52,336.50 in payments received directly from Frank Gluth in the summer of 2008 did not appear in the monthly operating reports, and therefore were not disclosed at all, or at least not until Q&H filed its "Supplemental Disclosure of Compensation" in July 2011 after being compelled to do so by court order.

I do not believe that the Q&H attorneys were trying to actively hide information regarding compensation or get away with payments that they felt sure would be disapproved or disgorged if disclosed. But, at the same time, I am disturbed by the 'who cares?' attitude they displayed in

---

[4]The actual April 10, 2007 attorney retention agreement submitted as an exhibit by the U.S. Trustee states that the Debtor agreed to pay "an advance payment retainer in the total amount of $13,500.00 plus court cost advancement in the amount of $1,500." (UST Ex. 62-1).

response to the U.S. Trustee's objections throughout the litigation over the fees. For example, in the testimony of Ms. Berneman, despite testifying as to her "expertise in the area" of bankruptcy and many years of experience to justify her hourly rate (Tr. 354:1-12, 652:10-20), she testified that she believed Rule 2016(b) only applied to fee sharing agreements. (Tr. 378:12-25, 379:1-7)). While Rule 2016(b) does require disclosure of fee sharing agreements in addition to disclosure of fees paid and promised, it is implausible that someone with "expertise" in bankruptcy - or even a basic ability to read - could read the clear language of the rule and come to that conclusion.[5] Ms. Berneman also testified that it was common for Q&H to get a personal guarantee of a principal or other party of a debtor's attorneys' fees to Q&H in 'larger cases,' that neither she nor Mr. Benjamin typically disclosed the existence of such a guarantee and that she still did not believe such a guarantee needed to be disclosed. (Tr. 405:8-25). Again, it is inconceivable to me how any attorney could read Section 329(a) and not realize that a guarantee of fees must be disclosed. First, the statute expressly requires disclosure not only of compensation already paid, but also all compensation "agreed to be paid." Second, if there was any doubt about whether the clause covered agreements by parties other than the debtor, Section 329(a) removes that doubt by ending with the requirement to disclose "the source of such compensation." Even where Q&H admitted knowledge of the rules and knowledge of the facts, they continually demonstrated a refusal or extreme reluctance to comply with those rules. Thus, even if the Court believes the testimony that Q&H had not realized at the time that two

---

[5]It was not entirely clear from Ms. Berneman's testimony whether she was saying that she thought the whole subsection applied only to fee sharing agreements or just the third sentence, which deals with supplemental statements. Even if the latter, however, the third sentence makes no reference to fee sharing and any such conclusion is either based on a frivolous argument or on a grossly negligent reading of the rule.

payments of fees came directly from Mr. Gluth rather than from the Debtor, Ms. Berneman testified on May 12, 2011, that at least by the date of the testimony she had learned of the payments and realized that the payments should be disclosed in a supplemental statement under Rule 2016(b). (Tr. 400:4-25). Mr. Benjamin testified to the same. (Tr. 614:10-25). Yet, Q&H still did not file such a disclosure statement until July 22, 2011, over two months after the trial, and only did so after the U.S. Trustee brought a motion to compel and the Court entered an order compelling Q&H to do so. Even the title of the July 2011 disclosure shows Q&H's stubborn attitude that they did nothing wrong. Q&H entitled it a "Supplemental Disclosure of Compensation of Attorney for Debtor," misleadingly implying that Q&H had filed an initial disclosure of compensation as it was required to do.

### B. Disclosure of Connections

Q&H showed a similar disregard for the requirements to disclose connections to the debtor and conflicts of interest. Under Section 327, counsel for a chapter 11 debtor-in-possession must be approved by the Court, and under Bankruptcy Rule 2014 the debtor-in-possession must file an application to gain that approval.[6]  Rule 2014 states that the application must state

> the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the

---

[6]Both Section 327 and Rule 2014 speak of the "trustee" rather than the debtor-in-possession. However, Section 1107(a) gives the debtor-in-possession the rights and duties of a trustee, including to employ counsel on behalf of the estate. Section 1107(b) notes that a person is not disqualified for employment under Section 327 solely because the person represented the debtor prepetition.

United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014(a).   Furthermore, the application must "be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Id.

The term "connections" used in Rule 2014(a) is considerably broader than the terms "disinterested" and "interest adverse to the estate" used in Section 327(a).   Thus an attorney must disclose a connection even if he does not believe it would disqualify him under Section 327(a).   As the Seventh Circuit Court of Appeals has stated, professionals "cannot pick and choose which connections are irrelevant or trivial." U.S. v. Gellene, 182 F.3d 578, 588 (7th Cir. 1999) (internal citation omitted).   Instead, no "matter how trivial a connection appears to the professional seeking employment, it must be disclosed." In re Envirodyne Indus., 150 B.R. 1008, 1021(Bankr. N.D. Ill. 1993) (Schwartz, J.).   Counsel who "fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation." Gellene, 182 F. 3d at 588 (quoting In re Crivello, 134 F.3d 831, 836 (7th Cir. 1998)).   Thus "denial of fees or disqualification may be justified even when the professional is in fact disinterested." In re Raymond Professional Group, Inc., 421 B.R. 891, 906 (Bankr. N.D. Ill. 2009) (quoting In re Midway Indus. Contractors, 272 B.R. 651, 662 (Bankr.N.D.Ill.2001)).

It is not sufficient that connections are disclosed in other pleadings, such as a statement of financial affairs, or at a 341 meeting. "Bankruptcy courts have neither the resources nor the time to investigate the veracity of the information submitted in 2016(b) statements and affidavits and to root

out the existence of undisclosed conflicts of interest." In re Crivello, 134 F.3d 831, 839 (7th Cir.

1998).  Additionally, while Rule 2014(a) only expressly requires the disclosure to be made at the

time of the application to employ, and only "to the best of the applicant's knowledge," case law has

held that there is an ongoing obligation to supplement the disclosure if the applicant later learns of

undisclosed connections or conflicts later arise. In re Diamond Mortg. Corp. of Ill., 135 B.R. 78, 89

(Bankr. N.D. Ill. 1990) ("In addition to the specific requirements of § 327(a), two additional

requirements are implied under § 327(a): (1) the professional must disclose to the court and the

parties in interest all facts which might bear on the professional's qualification for retention under

§ 327(a) both at the time of the original application and on an ongoing basis; (2) the professional

must live up to all requirements of appropriate professional codes of conduct on a continuous basis.")

(emphasis added).  These implied requirements, in addition to simply being part of an attorney's duty

of candor towards a court,[7]  are necessary to implement Section 328(c), which gives the court the

power to disgorge fees "if, at any time during such professional person's employment under section

327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds

an interest adverse to the interest of the estate with respect to the matter on which such professional

person is employed." 11 U.S.C. §327(c) (emphasis added).

---

[7]See 2010 Illinois Rules of Prof'l Conduct 3.3(a) ("A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.").  The 1990 Illinois Rules of Professional Conduct, which were in effect for much of the relevant period were slightly less clear on the duty, but largely to the same effect. Subsection (a) stated that, "In appearing in a professional capacity before a tribunal, a lawyer shall not: (1) make a statement of material fact or law to a tribunal which the lawyer knows or reasonably should know is false," and subsection (b) stated that, "The duties stated in paragraph (a) are continuing duties." 1990 Illinois Rules of Prof'l Conduct 3.3.

Q&H failed to disclose in its application to employ the fact that Frank Gluth, the sole equity owner and one of the largest creditors of the Debtor, had guaranteed Q&H's fees and that Jeanne Miller had previously represented Mr. Gluth while at Q&H.  Again, I do not believe that Q&H was actively trying to hide its prior connection to Frank Gluth or the fact that he had guaranteed the Debtor's attorneys' fees.  But again, I am disturbed by the attitude that Q&H demonstrated towards the disclosure requirements both in its lax compliance and throughout this litigation.  For example, while Ms. Berneman testified that she had not realized at the time that Ms. Miller had done work for Mr. Gluth individually, Ms. Berneman also testified that even now that she has learned of that prior representation she still did not believe the connection had to be disclosed to the Court. (Tr. 677: 5-18).  This sentiment is echoed by Mr. Benjamin in the Supplemental Rule 2014 Affidavit that he grudgingly filed in May 2009, after the U.S. Trustee raised his objections to the fee application. Rather than simply disclosing the connection, he states that "Querrey & Harrow, Ltd. denies that the original affidavit pursuant to Bankruptcy Rule 2014 was erroneous" and that '[s]ubmission of this affidavit and any other supplemental affidavits shall not be deemed an admission that the original affidavit was deficient in any way." (Supplemental Affidavit of Robert R. Benjamin, ECF No. 678). Whether or not a guarantee of fees by the debtor's sole shareholder or a prior representation of that shareholder by a member of one's firm would disqualify an attorney under Section 327, there can be no doubt that it constitutes a relevant "connection[] with the debtor, creditors, any other party in interest, [or] their respective attorneys" that must be disclosed under Rule 2014(a). Moreover, while Mr. Benjamin and Ms. Berneman argued that they were not aware that Ms. Miller had previously represented Mr. Gluth, that is implausible.  This was not simply a matter of the 'right hand not

knowing what the left hand is doing' at a large law firm. It was not a coincidence that the Debtor

contacted Q&H, it was *because of* Ms. Miller and Q&H's prior representation of Mr. Gluth in estate

planning matters and that connection that they were retained by Gluth Bros. for the bankruptcy. Ms.

Miller testified that when she referred the Debtor to Mr. Benjamin and Ms. Berneman in the

bankruptcy department of Q&H she told them Frank Gluth was a client of the firm. (Tr. 262:18-20).

Additionally, the fact that the bankruptcy team frequently used Ms. Miller as a 'go-between' to get

information from the Debtor shows they were aware of the prior relationship and representation.


### C. Disinterestedness

Section 327(a) provides that a debtor-in-possession may only employ an attorney if (1) the

attorney "do[es] not hold or represent an interest adverse to the estate" and (2) the attorney is a

"disinterested person[.]" 11 U.S.C. § 327(a). Section 1107(b) creates an exception that "a person

is not disqualified for employment under section 327 of this title by a debtor-in-possession solely

because of such person's employment by or representation of the debtor before the commencement

of the case." 11 U.S.C. §1107(b) (emphasis added). Section 327(c) creates a further exception that

"a person is not disqualified for employment under this section solely because of such person's

employment by or representation of a creditor, unless there is objection by another creditor or the

United States trustee, in which case the court shall disapprove such employment if there is an actual

conflict of interest." 11 U.S.C. §327(c) (emphasis added). The term "disinterested person" is

defined in the Code as "a person that-(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer,

or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14).

In this case, there is no allegation that any Q&H attorney was a creditor, insider or former officer of the Debtor or that any such attorney themselves had an adverse interest to the estate or creditors, and therefore there is no issue as to 'disinterestedness.' Rather, the U.S. Trustee alleges that Frank Gluth held interests adverse to the estate and either Q&H attorneys represented Frank Gluth during the case or their prior representation of him means they "represented an interest adverse to the estate."

There is little doubt that Frank Gluth held an interest adverse to the estate. In addition to being the Debtor's sole shareholder, the Debtor listed an unsecured debt of $3,622,318 to Mr. Gluth in its schedules, Mr. Gluth received over $400,000 in payments from the Debtor during the one-year prepetition preference period for insiders, Mr. Gluth asserted ownership in two pieces of the Debtor's real estate worth as much as $1.8 million, and Mr. Gluth asserted an administrative expense claim against the estate for $155,364.16. However, the U.S. Trustee was unable to prove that Q&H actually and actively represented Frank Gluth individually during the course of the bankruptcy. It would have been better if Q&H had been able to present written evidence of the termination of their prior representation of Mr. Gluth, but each of the Q&H attorneys testified that as soon as the firm began representing the Debtor they ceased representing Mr. Gluth. (See, e.g., Affidavit of Jeanne Miller, UST Ex.40-1, ECF No. 680). Written correspondence from Q&H attorneys showed that, at

least on a conscious level, the attorneys believed they were acting primarily in the interest of the

Debtor, not Frank Gluth. Thus, for example, while the U.S. Trustee argued that a statement by Ms.

Berneman in a January 2009 e-mail to Ms. Miller stating, "That way we can file [the Debtor's and

Mr. Gluth's 'withdrawals from plan'] together without looking like we represent Frank," was evidence

that Q&H was trying to hide its representation of Mr. Gluth, I believe in context it shows that Ms.

Berneman was simply trying to make clear that she did not represent Mr. Gluth.  (UST Ex. 55-1).

Thus, later in the same e-mail, Ms. Berneman stresses, "We won't be able to represent Frank's

interests at the hearing next Wednesday."  Id.  Similarly, while the fact that Ms. Miller began

representing Frank Gluth shortly after she left Q&H seems to cast doubt on whether Mr. Gluth fully

realized that Q&H was not representing him, there is other evidence that he did. Most notably, when

Mr. Gluth attempted to sell the Shop Parcel in May or June 2007, he retained separate counsel, Tom

Zanck, and did not even inform Q&H of his attempts.

   While Q&H attorneys might have been overly influenced by Mr. Gluth or believed him more

than they should have, that is often true where attorneys represent corporations and have to rely on

corporate officers for information.  It seems they took into consideration Mr. Gluth's interests when

they felt such interests were aligned with the Debtor's, but I do not believe they actively took steps

that they believed to be against the interest of the Debtor.  Thus, while Ms. Miller, who had the

closest relationship with Mr. Gluth, showed certain sympathy or even bias in favor of Mr. Gluth in

some of the language she chose in her legal memorandum on the ownership of the Shop Property,

she ultimately came to a conclusion and recommendation that was in favor of the Debtor and against

the interests of Mr. Gluth. (UST Ex. 51). The same is true for Ms. Berneman's reaction e-mail to the

memorandum, in which she recommended adding the disputed property to the schedules and selling

the property to bring funds into the estate.  While Mr. Benjamin's reaction was to come to the

opposite conclusion and to believe the property was owned by Mr. Gluth, he testified that this

conclusion was based on the fact that Mr. Gluth adamantly stated that a deed existed and that he

could find it.  Thus, Mr. Benjamin's reaction seems to be a matter of trusting Mr. Gluth too much

rather than actively trying to represent or protect his interests.  From the evidence presented, I cannot

say any Q&H attorney actively represented Mr. Gluth.  If they took any steps that potentially or

ultimately benefited Mr. Gluth to the detriment of the Debtor, it appears to be caused more by poor

business judgment than by an active conflict of interest.[8]

    If Q&H did not represent Mr. Gluth during the pendency of the case, the next question is

what the effect of the prior representation of Mr. Gluth is.  The Second Circuit Court of Appeals has

held that the phrase "represent an interest adverse to the estate" covers only current representation

and not prior representation.  Lambert v. Coan (In re AroChem Corp.), 176 F.3d 610, 623-24 (2nd

Cir. 1999).  The court based its holding on the fact that Congress chose to use the present tense, and

the court contrasted several phrases in the definition of "disinterested person" in Section 101(14) that

used both the present and past tenses.  AroChem, 176 F.3d at 623 ("Congress' use of a verb tense is

---

[8]This is not to say that an objecting party must demonstrate actual harm to the estate.
Where it is clear that a debtor's attorney jointly represented an adverse party, case law is clear
that the attorney is disqualified even if the attorney is careful not to take any act that would
actually harm the estate.  See, e.g., In re Bellevue Place Assocs., 171 B.R. 615, 626 (Bankr. N.D.
Ill. 1994) (stating that the purpose of §327(a) and Rule 2014(a) is "is to avoid even the
appearance of a conflict, regardless of the integrity of the professional seeking to be employed")
(citing In re Grabill Corp., 113 B.R. 966, 969 (Bankr.N.D.Ill.1990), aff'd 983 F.2d 773 (7th
Cir.1993)).  However, here the issue was whether Q&H was currently representing Frank Gluth,
and the U.S. Trustee was unable to prove that it was.

significant in construing statutes."). I am less convinced that Congress intended to exclude past

representation as a factor. For example, AroChem's reading of Section 327(a) would make Section

1107(b) meaningless. Section 1107(b) provides that "[n]otwithstanding section 327(a) of this title,

a person is not disqualified for employment under section 327 of this title by a debtor in possession

solely because of such person's employment by or representation of the debtor before the

commencement of the case." But, if Section 327(a) does not cover representation of or employment

by any party before the commencement of the case, there is no need for the exception Section

1107(b) provides. The same is true for the exception in Section 327(c). Although Section 327(c)

is also worded in the present tense and does not expressly reference prior representation, the

legislative history demonstrates that Section 327(c) was intended to create an "additional exception"

where the professional person would otherwise be disqualified "solely because of the person's prior

employment by or representation of a secured or unsecured creditor." HR Rep No. 595, 95th Cong.

1st Sess 328 (1977); S Rep No. 989, 2d Sess 38 (1978) (emphasis added). Thus, I am not prepared

to say that prior representation of a party with an adverse interest can never justify disqualification.

However, Section 327(c) makes clear that prior representation of a creditor cannot be the sole

reason to disqualify potential counsel. Here, the U.S. Trustee has objected, and therefore the Court

must look to whether the prior representation of Frank Gluth created an "actual conflict of interest."

The phrase 'actual conflict of interest' is not defined in the Bankruptcy Code. The Seventh Circuit

Court of Appeals has defined the broader phrase "hold or represent an interest adverse to the estate"

from Section 327(a) as

> (1) to possess or assert any economic interest that would tend to lessen the value of
> the bankruptcy estate or that would create either an actual or potential dispute in

which the estate is a rival claimant; or (2) to possess a predisposition under
circumstances that render such a bias against the estate.

In re Crivello, 134 F.3d 831, 835 (7th Cir. 1998). The court of appeals has also discussed the policy

behind the statute, stating that the "Code reflects Congress' concern that any person who might

possess or assert an interest or have a predisposition that would reduce the value of the estate or

delay its administration ought not have a professional relationship with the estate." U.S. v. Gellene,

182 F.3d 578, 588 (7th Cir. 1999) (citing Crivello, 134 F.3d at 835).   There are two possible

interpretations of the word "actual" in Section 327(c) - that it is to distinguish current from potential

future conflicts of interest, or that it is to distinguish actual conflicts from the mere appearance of

conflict.[9]   Most courts have applied the term to distinguish between current, actual conflicts and

future, potential conflicts.  Under this line, a conflict is 'actual' when "the professional serves two

presently competing and adverse interests," but is merely 'potential' when "the competition does not

presently exist, but may become active if certain contingencies arise." In re Raymond Professional

Group, Inc., 421 B.R. 891, 902 (Bankr. N.D. Ill. 2009) (Schmetterer, J.) (quoting In re Am. Printers

& Lithographers, Inc., 148 B.R. 862, 866 (Bankr.N.D.Ill.1992)).  In contrast, in In re Grabill Corp.,

Judge Squires held that such a concept of "potential conflicts" was a "contradiction of terms." 113

B.R. 966, 970 (Bankr. N.D. Ill. 1990).  He therefore concluded that "whenever counsel for a debtor

corporation has any agreement, express or implied, with management or a director of a debtor, or

with a shareholder, or with any controlling party, to protect the interest of that party, counsel holds

a conflict. That conflict is not potential, it is actual, and it arises the date that representation

---

[9]See, e.g.,   In re Marvel Enter. Group, Inc., 140 F.3d 463, 476 (3rd Cir. 1998) (holding
that while a court has discretion to deny application where there is a 'potential conflict,' mere
"appearance of a conflict" is insufficient grounds to disqualify).

commences." Id. 113 B.R. at 970-71 (quoting In re Kendavis Industries International, Inc., 91 B.R.

742, 754 (Bankr.N.D.Tex.1988)).   The Seventh Circuit Court of Appeals cited Grabill in In re

Wiredyne, 3 F.3d 1125 (7th Cir. 1993), seemingly with approval, but distinguished it from the facts

at hand which related to disgorgement of prepetition fees under Section 329, and not approval of

employment or disgorgement of postpetition fees under Sections 327 and 328.   The court in

Wiredyne also cited Grabill for the proposition that the "impartiality requirement of sections 327 and

328 has been interpreted strictly." Id. However, under Section 328(c), even where there is an actual

conflict, where the employment has been previously approved, a bankruptcy court has discretion to

decide whether or not to disgorge fees, and "should weigh the equities in deciding whether to deny

fees under § 328(c), just as it does in deciding to reduce fees under § 329." In re Crivello, 134 F.3d

831, 838 (7th Cir. 1998).   This is so even if the original approval of employment was in error.   Id,

134 F.3d at 838 ("A judgment is not void simply because it is erroneous.").

Neither a guarantee of fees by an insider or creditor nor the prior representation of an insider

or creditor is a *per se* reason to disqualify counsel for a debtor.   Nor were any of the acts of Q&H

that the U.S. Trustee alleged demonstrated a conflict of interest necessarily inconsistent with the acts

of an attorney who represents a corporate debtor but has no such connections.   To the extent the acts

raise the suspicion that Q&H's motives, conscious or unconscious, were not purely in the interest of

the Debtor, I feel the issue is addressed better in the context of the failure to disclose.   Had the

connections been disclosed up front, it seems unlikely that the U.S. Trustee or creditors would have

objected to the motion to employ.   But at the same time, the parties would have been more on guard,

and might also have demanded that Ms. Miller be 'screened' or 'walled off' from the bankruptcy

matters. Therefore, it seems if there was any harm to the estate, it was caused more by the failure to disclose the connections than by the connections themselves.

### D. Reasonableness of Fees

Under Section 330, any compensation awarded must be "reasonable," and the court may not allow compensation for "(i) unnecessary duplication of services; or (ii) services that were not (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." 11 U.S.C. § 330(a)(4)(A). Q&H supported each of their fee applications with itemizations, and the U.S. Trustee did not object to their billing rate or to any specific item as duplicative or unusual. Rather, the U.S. Trustee objected to work done on the plan of reorganization that the Debtor ultimately withdrew its support from and that was never confirmed, and for work on claims and objections to claims, since the Debtor ultimately never made any payments on claims. However, since the standard is whether services were "reasonably likely" to benefit the estate, the determination must be based on the circumstances at the time the services were performed, and not simply in hindsight. See, e.g., In re Taxman Clothing, Co., 49 F.3d 310 (7th Cir. 1995) (trustee's attorney should not be compensated for pursuing a preference claim "once it became reasonably obvious that further litigation would cost more than it was likely to bring into the estate"). The U.S. Trustee argues that Q&H should have realized at least by some point that the Debtor would not be able to continue to operate or successfully reorganize. However, Q&H testified that until the time that they sought to 'withdraw their support' from the plan of reorganization, they reasonably believed that the company could continue to operate. They argued that the length and extent of the recession

which started in 2007 was unexpected and unpredictable, and that the recession hit the construction

industry especially hard. Therefore, I will not reduce the compensation on this basis.[10]

## V.  CONCLUSION

Because there was insufficient evidence to demonstrate that Q&H actually represented Frank

Gluth individually during the course of the bankruptcy or an _actual_ conflict of interest, I will not

disgorge Q&H's fees in full. However, because of Q&H's almost wanton disregard for the disclosure

requirements of the Bankruptcy Code and Rules despite ample opportunity to cure when facts were

discovered or deficiencies were pointed out by the U.S. Trustee, I feel severe sanctions are

warranted. In light of Q&H's steadfast assertion that it did nothing wrong, I would have serious

concerns about the veracity of its disclosure statements in future cases if the firm thought it could

get away with a minor slap on the wrist. Moreover, even if the U.S. Trustee was unable to

demonstrate an actual conflict of interest, this is not a simply a technical noncompliance or an

instance of "no harm no foul." There remains the serious possibility that Q&H attorneys did not take

as an aggressive stance against Frank Gluth as they might have had there been no prior relationship

with him or guarantee of fees by him, that the creditor's committee and other parties in interest might

have relied on the apparent impartiality of Q&H to a greater extent than they might have had they

been aware of the prior relationship, and that Frank Gluth himself might not have fully understood

---

[10]Needless to say, while Section 330(a)(6) does allow for compensation for time
reasonably required to prepare a fee application, given the fact that this extended litigation arose
from Q&H's refusal to comply with the disclosure rules, and the firm's refusal to provide
information, the Court will not consider any request by Q&H for fees incurred in the litigation
over the final fee application.

that Q&H no longer represented him individually or the consequences of that fact.

THEREFORE, IT IS ORDERED that a cumulative amount under Q&H's three interim fee applications and final fee application of $202,420.53 in fees and expenses will be approved, which has already been paid in full. The remainder of the fees sought in Q&H's fee applications is denied, and Q&H is hereby ordered to disgorge the disallowed $128,737.60 in fees previously received or held in escrow to the Creditor Trustees on or before November 18, 2011.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

DATE: October 19, 2011

The Honorable Manuel Barbosa
United States Bankruptcy Judge